# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

STATE FARM MUTUAL AUTOMOBILE INSURANCE    )
COMPANY and STATE FARM COUNTY MUTUAL    )
INSURANCE COMPANY OF TEXAS,    )
     )
                           Plaintiffs,    )
     )
        v.    )    Case No.
     )
     )
COMPLETE PAIN SOLUTIONS LLC n/k/a    )    **PLAINTIFFS DEMAND**
COMPLETE PAIN SOLUTIONS PLLC;    )    **TRIAL BY JURY**
ALJ FLORENCE SPARROW, M.D.;    )
SEE LOONG CHIN, M.D.; and MMRI HOLDCO LLC    )
n/k/a MRI HOLDCO ROLLOVER, LLC,    )
     )
                         Defendants.    )

## COMPLAINT

State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm

County Mutual Insurance Company of Texas ("State Farm County"), for their Complaint against

Defendants Complete Pain Solutions, LLC n/k/a Complete Pain Solutions, PLLC ("Complete

Pain"); Alj Florence Sparrow, M.D. ("Dr. Sparrow"); See Loong Chin, M.D. ("Dr. Chin"); and

MMRI Holdco LLC n/k/a MRI Holdco Rollover, LLC ("MMRI Holdco") (collectively,

"Defendants"), allege as follows:

## I.    NATURE OF THE ACTION

1.    This action is brought by State Farm Mutual and State Farm County based upon

hundreds of medical bills and supporting documentation that are fraudulent, which Dr. Sparrow,

Dr. Chin, and Complete Pain have knowingly submitted, and caused to be submitted, to State Farm

Mutual and State Farm County for medically unnecessary evaluations, spinal injections, and

related procedures, which were purportedly provided to individuals ("patients") who were

involved in motor vehicle accidents and asserted claims for damages against State Farm Mutual and State Farm County or individuals who were eligible for insurance benefits under State Farm Mutual and State Farm County policies.

2.     As discussed below, Dr. Sparrow and Dr. Chin (collectively, the "Doctor Defendants") falsely purport to legitimately examine patients reporting neck and/or back pain and prescribe either:  (1) the same type of spinal injections, namely a medically unnecessary series of three epidural steroid injections ("ESIs") in at least one region of the spine for nearly all such patients and ESIs in multiple spinal regions for numerous patients, (*see* Exs. 1A, 1B); and/or (2) spinal MRIs whose results are used to support the Doctor Defendants' eventual recommendation and/or performance of ESIs and also serve to bolster demand packages directed to State Farm Mutual and State Farm County from personal injury attorneys ("PI Attorneys") (*see* Ex. 2).  Dr. Sparrow, Dr. Chin, and occasionally other doctors at Complete Pain then purport to perform such injections on certain patients without regard to whether they are needed.  (*See* Ex. 3.)

3.     The bills and supporting documentation Complete Pain and the Doctor Defendants submit, and cause to be submitted, to State Farm Mutual and State Farm County are fraudulent because:

   a.     the Doctor Defendants do not perform legitimate examinations of the patients;

   b.     patterns in the findings within the initial examination reports ("Initial Exam Reports") prepared by the Doctor Defendants are not credible and serve as pretext to support their predetermined recommendations for spinal MRIs and/or recommendations for three medically unnecessary ESIs in at least one region of the spine – and often multiple regions – for nearly all patients reporting neck and/or back pain (*see* Exs. 1A, 1B);

   c.     many of the patients at issue undergo spinal MRIs at Memorial MRI & Diagnostic, LLC n/k/a Memorial MRI & Diagnostic, PLLC ("Memorial"), a facility sharing the same ownership and many of the same office locations as Complete Pain, and the Doctor Defendants use the purported positive findings made by Memorial radiologists on virtually all spinal MRIs they

read as justification to support their predetermined and medically unnecessary ESI recommendations. (*See* Ex. 2.) Several MRI films read by Memorial radiologists reveal they have documented conditions that do not exist or exaggerated the severity of age-expected degenerative conditions that may exist;

d.      the ESIs the Doctor Defendants recommend and purportedly perform are not recommended and performed because they are medically necessary, but rather to substantially inflate the severity and potential value of the patients' liability insurance claims;

e.      the boilerplate operative reports ("Operative Reports") prepared by the Doctor Defendants and occasionally other doctors at Complete Pain for the ESIs they purportedly perform are not credible based upon patterns in the patients' responses to the ESIs (*see* Ex. 3); and

f.      the Doctor Defendants and other doctors at Complete Pain purportedly perform epidurograms in addition to fluoroscopic imaging when conducting ESIs, which is not credible, not medically necessary, and performed to justify a significant additional charge from Complete Pain for each purported epidurogram.

4.      The fraudulent scheme enriches Defendants by exploiting two common claims scenarios, namely (a) bodily injury claims ("BI Claims") made by individuals not substantially at fault for automobile accidents to the insurance companies of the individuals who are substantially at fault for such accidents ("At-Fault Drivers"), in which they seek to recover economic losses (including past and future medical expenses) and noneconomic losses (including pain and suffering); and (b) underinsured/uninsured motorist claims ("UM Claims") made by individuals to their own insurance companies if their recoveries under BI Claims from the At-Fault Drivers' insurance companies are insufficient to compensate the individuals for their economic and non-economic losses as a result of the accident.

5.      Under Texas law, insurers may be subject to substantial liability if they fail to accept "reasonable" settlement demands on BI Claims.  Specifically, under the *Stowers* doctrine, if (1) an insurer for an At-Fault Driver fails to accept a reasonable settlement demand at or within policy limits in a short time frame, often 30 days or less, specified in the written demand from the

injured party's PI Attorney, and (2) the At-Fault Driver incurs a judgment in excess of policy limits at trial, the insurer may be subject to liability for the excess judgment.  *See G.A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544 (Tex. 1929).

6.       With respect to UM Claims, Texas law provides an insurer may likewise be liable to its own insured for bad faith if it "fail[s] to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim with respect to which the insurer's liability has become reasonably clear."  TEX. INS. CODE § 541.060(a)(2)(A); *see also* TEX. INS. CODE § 542.003.  If found liable for bad faith, an insurer may be responsible for its insured's compensatory damages, attorneys' fees, and potentially treble damages.  TEX. INS. CODE § 541.152.

7.       Dr. Sparrow, Dr. Chin, and Complete Pain's scheme is designed to enrich Defendants by inducing State Farm Mutual and State Farm County to: (1) rely on their bills and supporting documentation that on their face substantiate the need for, and often the performance of, one or more ESIs for nearly all patients reporting neck and/or back pain; and (2) settle BI and UM Claims within policy limits, and often for all or most of the limits, to protect themselves and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad faith claims.

8.       To facilitate their scheme, Dr. Sparrow, Dr. Chin, and Complete Pain:  (a) prepare fraudulent Initial Exam Reports to create the appearance patients suffered serious injuries that warrant the need for a series of three ESIs, often to more than one spinal region; (b) prepare fraudulent Operative Reports for each ESI that the Doctor Defendants and other Complete Pain doctors purportedly perform, documenting their purported use of epidurograms and the patient's purported positive response from each injection; (c) prepare bills from Complete Pain with typical charges of $550 for the initial examinations and improperly unbundled charges totaling more than

$9,000 for each ESI procedure, including a $1,650 charge for each medically unnecessary epidurogram purportedly performed during each ESI; and (d) provide these fraudulent documents and bills to the PI Attorneys representing the patients in BI Claims and UM Claims who, in turn, submit the bills and documentation to State Farm Mutual and State Farm County to support written time limit demands to settle the claims, often within 15 days or less.  (*See* Ex. 4, Demand Appendix; *see also* Ex. 5, Demand Letter for Patient M.L. ("[A]n insurance company placing the interests of its insured over its own interests would be compelled to accept this offer, and would be subject to liability recognized under . . . *Stowers* . . . in the event Plaintiff was to achieve a judgment in excess of policy limits.").)

9. Dr. Sparrow, Dr. Chin, and Complete Pain's fraudulent bills and supporting documentation are designed to be and, in fact, have been substantial factors in inducing State Farm Mutual and State Farm County to settle the BI Claims and UM Claims at issue by causing them to make higher settlement offers than would be warranted without the fraudulent bills and supporting documentation from Complete Pain and the Doctor Defendants.  (*See* Ex. 4, Demand Appendix.) Absent Dr. Sparrow, Dr. Chin, and Complete Pain's fraudulent bills and supporting documentation, many, if not most, of these claims would involve primarily chiropractic and/or physical therapy treatment for alleged soft tissue injuries with total medical expenses that would be significantly less than policy limits.  The fraudulent examination reports with recommendations for a series of three ESIs and the performance of one or more medically unnecessary ESIs with total corresponding charges of over $9,000 per injection procedure, cause the severity and potential value of the claims to be artificially and substantially inflated.

10. State Farm Mutual and State Farm County have sustained damages of more than $1.9 million in settling the BI and UM Claims at issue.  Dr. Sparrow, Dr. Chin, and Complete

Pain's fraudulent documentation and bills have been a substantial factor and, in fact, have caused State Farm Mutual and State Farm County to incur damages by agreeing to settle claims that otherwise might not have been settled, or by paying substantially more to settle these claims than they would have had they known Dr. Sparrow, Dr. Chin, and Complete Pain's bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the target of Dr. Sparrow, Dr. Chin, and Complete Pain's scheme and their damages are directly related to and a natural consequence of the scheme.  As a result, State Farm Mutual and State Farm County are entitled to damages in excess of $1.9 million, or to a lesser amount to be proven at trial, but no less than the amounts Defendants actually received as a result of the scheme.

11.     The scheme began at least as early as September 2015 and has continued uninterrupted since that time.

12.     State Farm Mutual and State Farm County bring this action asserting statutory claims under 18 U.S.C. § 1962(c) and (d) ("RICO"), as well as a common law claim for money had and received to recover actual damages in excess of $1.9 million, or to a lesser amount to be proven at trial, but no less than the amounts Defendants actually received as a result of the scheme, plus treble damages and costs, including reasonable attorneys' fees.

## II.     JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the RICO causes of action brought under 18 U.S.C. §§ 1961 et seq. because they arise under the laws of the United States.

14.     Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over the money-had-and-received cause of action because it is so related to the RICO causes of action over which the Court has original jurisdiction that they form part of the same case or controversy.

15.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because Defendants reside here and a substantial part of the events or omissions that gave rise to the causes of action occurred here.

## III.   THE PARTIES

### A.     Plaintiffs

16.     State Farm Mutual Automobile Insurance Company is a citizen of the state of Illinois.  It is incorporated under the laws of the state of Illinois, with its principal place of business in Bloomington, Illinois.  State Farm Mutual is licensed and engaged in the business of insurance in Texas.

17.     State Farm County Mutual Insurance Company of Texas is a citizen of the state of Texas.  It is incorporated under the laws of the state of Texas, with its principal place of business in Dallas, Texas.  State Farm County is licensed and engaged in the business of insurance in Texas.

### B.     Defendants

18.     Defendant Alj Florence Sparrow, M.D. resides in and is a citizen of the state of Texas.  Dr. Sparrow has been licensed to practice medicine in Texas since 1995.   She was also licensed to practice medicine in Florida from 2000 until 2013.  Starting in or about September 2015, she began performing evaluations and spinal injections at Complete Pain.  Since that time, Dr. Sparrow, Dr. Chin, and Complete Pain have knowingly submitted, and caused to be submitted, hundreds of medical bills and supporting documentation that were fraudulent to State Farm Mutual and State Farm County, in the claims described in part in the charts attached hereto as Exs. 1A, 1B, 2, and 3.

19.     Defendant See Loong Chin, M.D. resides in and is a citizen of the State of Texas.  Dr. Chin has been licensed to practice medicine in Texas since 2015.   Starting in or about September 2015, Dr. Chin began performing evaluations and spinal injections at Complete Pain.

Since that time, Dr. Chin, Dr. Sparrow, and Complete Pain have knowingly submitted, and caused to be submitted, hundreds of medical bills and supporting documentation that were fraudulent to State Farm Mutual and State Farm County, in the claims described in part in the charts attached hereto as Exs. 1A, 1B, 2, and 3.

20.     Defendant Complete Pain Solutions, LLC n/k/a Complete Pain Solutions, PLLC was originally formed as a manager-managed Texas limited liability company on April 15, 2015. Complete Pain listed Memorial as its initial manager on its Certificate of Formation at the address 1241 Campbell Rd., Houston, Texas 77055, which is also one of Complete Pain's four locations. On November 15, 2018, Complete Pain filed its Public Information Report with the Texas Secretary of State, which listed Anthony Ludlow ("Ludlow") as its only Director and MMRI Holdco as its 100% owner.  On August 13, 2019, Complete Pain filed its 2019 Public Information Report, which again listed Ludlow as its sole Director and MMRI Holdco as the 100% owner of Complete Pain.  On September 25, 2019, Complete Pain filed an Amended and Restated Certificate of Formation changing its name to Complete Pain Solutions, PLLC, and listing its sole member as Memorial MRI & Diagnostic, PLLC.  According to that filing, Complete Pain's principal office is now located at 9434 Katy Fwy, Suite 408, Houston, TX 77055, which is also Memorial's principal office.  Complete Pain and Memorial also share the same tax identification numbers and radiologic licenses.  Complete Pain provides pain management services at four locations, each of which it shares with Memorial:  (a) 1241 Campbell Road, Houston, Texas 77055; (b) 1900 N Loop West, Ste. 160, Houston, Texas 77018; (c) 11211 S Highway 6, Ste. B, Sugar Land, Texas 77498; and (d) 1360 W. Campbell Rd., Ste. 122, Richardson, Texas 75080.  Since in or about September 2015, Complete Pain has knowingly submitted, and caused to be submitted, hundreds of medical bills

and supporting documentation that were fraudulent to State Farm Mutual and State Farm County, in the claims described in part in the charts attached hereto as Exs. 1A, 1B, 2, and 3.

21.     Defendant MMRI Holdco LLC n/k/a MRI Holdco Rollover, LLC is a Texas limited liability corporation formed on or about February 16, 2012.  According to its Certificate of Formation, the company has been managed by a Board of Managers, which includes Ludlow and David J. Hook ("Hook"), and its corporate address is 1345 Noel Road, Suite 1607, Dallas, Texas, 75240.  On information and belief, both Ludlow and Hook are managing directors of Baymark Management, LLC, a private equity firm in Dallas, Texas.  On October 14, 2019, MMRI Holdco filed a Certificate of Amendment to its Certificate of Formation changing its name to MRI Holdco Rollover, LLC.  In addition to owning Complete Pain, on information and belief, MMRI Holdco has also held a 100% percent ownership interest in Memorial from approximately August 2014 to October 2019.  On information and belief, for at least the period of time for which it was Complete Pain's sole owner, MMRI Holdco received a portion of the funds obtained through Dr. Sparrow, Dr. Chin, and Complete Pain's fraudulent scheme.

## IV.     ALLEGATIONS COMMON TO ALL COUNTS

### A.     The Legitimate Diagnosis and Treatment of Neck and Back Pain

22.     When a patient complains of neck and back pain following a motor vehicle accident, a licensed professional must obtain a detailed history and perform a legitimate examination to arrive at a proper diagnosis.  Based upon a legitimate diagnosis, a licensed professional must then engage in medical decision making to design a legitimate treatment plan tailored to the unique needs of each patient.

23.     The decision of which, if any, types of treatment are appropriate for a patient, as well as the level, frequency, and duration of the various treatments should be individualized.  This individualized decision must consider the patient's unique circumstances, including his or her:

(a) age; (b) social, family, and medical history; (c) physical condition, limitations, and abilities; (d) location, nature, and severity of the injury and symptoms; (e) response to any previous treatment; and (f) the nature of the accident.

24.     Treatment plans should generally start with conservative care that is not invasive, such as anti-inflammatory medications, chiropractic care, and/or physical therapy, which may benefit patients by healing their injuries and relieving their symptoms with minimal associated risks and costs.  If patients' symptoms are not relieved through conservative care, other forms of treatment may be appropriate to relieve their symptoms, including various kinds of injections and other procedures designed to reduce pain and other symptoms caused by inflammation, irritation, or other conditions.  As with any other treatment option, whether to perform any kind of injection or other procedure should be tailored to the unique circumstances of each patient.

**B.     The Doctor Defendants' Purported Treatment Runs Contrary to the Legitimate Use of ESIs and Other Common Spinal Injections**

25.     A provider may recommend and perform injections to treat pain in areas of the spine and to diagnose the source of the pain.  Because injections are invasive, expose patients to ionizing radiation, often involve the injection of steroids into the body, and may involve the use of sedation, they present associated risks as well as increased costs to patients.  Therefore, injections should be performed only when appropriate indications are present and they are medically necessary to diagnose and/or treat pain in and around the spine or other structures, to alleviate pain to facilitate conservative care, or to alleviate pain after conservative care has failed or is not an option.  Three common types of spinal injections are ESIs, facet injections ("FIs"), and medial branch blocks ("MBBs").

26.     The indications for ESIs are different than the indications for FIs and MBBs.  The common clinical indication for ESIs is nerve-related pain radiating from the neck into the

shoulders or arms or from the lower back into the buttocks or legs.  By contrast, the common clinical indication for FIs and MBBs is chronic pain primarily concentrated in the back or neck (i.e., axial pain).  As discussed below, in a legitimate pain management clinical setting, across a population consisting of hundreds of patients complaining of neck and/or back pain, one would expect a mixture of patients for which (1) no spinal injections would be indicated, (2) ESIs would be indicated, (3) FIs would be indicated, (4) MBBs would be indicated, and (5) muscular injections, such as trigger point injections ("TPIs"), would be indicated.  In other words, one would not expect to see spinal injections indicated for virtually all patients with neck and/or back pain, nor would one expect to see ESIs indicated for virtually all such patients.  (*See* Ex. 1B, Diagnosis and Treatment Plan Appendix.)

27.     Moreover, there are three basic types of ESIs – interlaminar, caudal, and transforaminal injections – each of which may be performed to relieve a patient's symptoms by introducing steroid medications into the epidural spaces surrounding the vertebral levels at which the suspected pain-generating pathologies exist.  An interlaminar ESI involves inserting a needle into the posterior epidural space between two adjacent vertebral lamina and delivering anesthetic and steroids, which then typically spread to epidural spaces above and below the injected space. A caudal ESI involves inserting a needle through the sacral hiatus (a small boney opening just above the tailbone) to deliver anesthetic and steroids that typically spread to epidural spaces above the injected space.  A transforaminal ESI involves inserting a needle into the intervertebral neural foramen.  In a transforaminal ESI, the provider injects the anesthetic and steroid into the area referred to as the "nerve sleeve," which allows the steroid to travel up the sleeve and into a targeted epidural space.  Although there is an increased level of technical expertise required to perform transforaminal ESIs, this type of injection allows for greater precision in targeting the source of

the patient's pathology, which results in a more concentrated delivery of the steroid into the affected area.  As discussed below, the Doctor Defendants routinely recommend and purport to perform interlaminar ESIs – which they identify as "translaminar" ESIs on their Operative Reports – but rarely caudal and never the more targeted, skill-intensive approach of transforaminal ESIs.

28.     Prior to recommending and performing an ESI, a thorough physical examination involving several orthopedic, neurological, and other tests is required to evaluate for associated sensory, motor, or reflex deficits in the involved limb(s) to help guide treatment and establish a baseline status before initiating invasive treatments such as injections.  Normally, the clinical findings and indications are correlated with radiologic evidence (e.g., MRIs) of nerve-root irritation, inflammation, or compression at spinal levels that are consistent with the distribution of the patients' nerve-related pain and/or physical examination findings and may be attributable to pathologies in and around the nerve roots.  As discussed below, the Doctor Defendants' Initial Exam Reports reveal the same cursory examination findings and result in recommendations that virtually all patients with neck and/or back pain who have undergone MRIs receive a series of three ESIs in at least one spinal region and, for many such patients, a recommendation for a series of three ESIs in at least two separate spinal regions.  (*See* Exs. 1A, 1B.)

29.     A recommendation for a "series of three" ESIs is not medically necessary.  According to guidelines published by the North American Spine Society, the American Academy of Physical Medicine and Rehabilitation, the American Academy of Pain Medicine, the Anesthesia Patient Safety Foundation, the American Society of Interventional Pain Physicians, and the Spine Intervention Society, a routine series of three injections after only an initial evaluation, like those recommended by the Doctor Defendants for nearly all patients, is never indicated.  That is because patients should be examined and assessed after each ESI to determine if another injection is

warranted.  A patient who receives minimal or no relief from an initial ESI is less likely to benefit from a second ESI.  Likewise, if a patient receives minimal or no relief from his or her first and second ESIs, it is even less likely the patient will benefit from additional ESIs.  Therefore, based upon the very low likelihood of success after a failed ESI and the associated risks and costs, as a general matter, repeat ESIs should not be recommended without an interval assessment of the patient's response and unless the patient gets more than minimal relief from prior ESIs.

30.     The patterns in the injections recommended by the Doctor Defendants and purportedly performed by the Doctor Defendants and other Complete Pain doctors are not credible. State Farm Mutual and State Farm County have thus far identified 484 Complete Pain patients who complained of neck and/or back pain when they were purportedly examined by Dr. Sparrow or Dr. Chin.  (See Exs. 1A-1B, Initial Exam Appendices.)  Of those patients, 336 either (a) received a spinal injection recommendation from the Doctor Defendants during their initial exam, (b) received one or more injections after their initial exam without a formal recommendation documented in any examination report, or (c) received a "cost estimate" from Complete Pain after their initial exam indicating they required one or more injections.  Of those 336 patients, 332 were recommended and/or received interlaminar ESIs,[1] two received a recommendation for a TPI, one received caudal ESIs without a formal recommendation, one received a cost estimate for a non-spinal injection (to their wrist) despite also having back pain, and none were recommended to receive FIs, MBBs, or transforaminal ESIs.[2]  Moreover, of those patients who were recommended

---

[1] One of these 332 patients received a recommendation for a TPI in addition to Dr. Sparrow's recommendation that he undergo a series of three cervical interlaminar ESIs.

[2] Three patients underwent additional procedures after undergoing one or more of their recommended ESIs – one receiving an MBB, one receiving a facet, and the other receiving an "epidural blood patch."  In all three cases, the Doctor Defendants performed the additional

interlaminar ESIs, more than 40% were recommended a series of three ESIs in two or more regions of the spine, meaning that the Doctor Defendants recommended these patients undergo *six or nine total injections*.  (Ex. 1B, Diagnosis and Treatment Plan Appendix.)

31.     Further, for the 148 patients who were not recommended an injection and/or did not receive an injection from Complete Pain, 114 of them (a) had not yet received an MRI at the time of their Complete Pain visit, (b) received a referral for an MRI from Dr. Sparrow or Dr. Chin, and (c) never returned to Complete Pain for a follow-up examination or injection.  Thus, it is likely they too would have received the same recommendations as virtually all other Complete Pain patients had they returned.  In any event, even the 34 patients who did not receive an injection recommendation, injection, or MRI referral nevertheless received the same cursory examinations with the same pattern findings that are not credible, and for many of them, the Initial Exam Reports specifically describe a medical condition for which injections may be contraindicated or indicate that injections were not recommended because the patient presented a high risk.

### 1.     Fluoroscopic Guidance and Epidurography

32.     To assist with needle placement, ESIs are typically performed under fluoroscopic guidance.  Fluoroscopy is a radiological imaging technique used to obtain real-time images of the internal structures of a patient to help guide the path and proper placement of the needle during an injection.  When fluoroscopic guidance is used, a physician inserts a needle into the targeted area, injects a contrast dye, and takes a picture using radiological imaging, which the physician uses to confirm the needle is in the correct position.  Once it is confirmed the needle is in the correct position, the injection of the medication can be performed.  As described below, Complete Pain

---

procedures without documenting any meaningful rationale for why such procedures were performed.

almost always improperly "unbundles" its charge for fluoroscopy, which amounts to $975 per procedure, when the cost of fluoroscopy should be included in the charge for each ESI.

33.     Unlike the use of fluoroscopic guidance, epidurography is not medically necessary to ensure appropriate needle placement for ESIs.  Epidurograms are typically indicated only if there is a concern regarding a condition, pathology, or structural abnormality in and around the patient's spine that might affect the flow of steroids into the targeted space.  Moreover, when an epidurogram is indicated, the provider performing the procedure should prepare a separate report of his or her findings from the epidurogram so future providers have the opportunity to incorporate those findings in further treatment of the patient.

34.     Almost all Operative Reports for Complete Pain patients undergoing ESIs document epidurograms were performed without identifying any potential spinal condition, pathology, or abnormality that might obstruct the flow of steroids in the spine.  Additionally, the Doctor Defendants and other Complete Pain doctors performing ESIs fail to provide a separate report of their findings from the epidurogram.  Instead, they merely include a single sentence in each report regarding the purported epidurograms, noting they were able to "identif[y] the needle tip within the epidural space with contrast medium spreading cephalad in caudal from the needle tip.[]"  (*See, e.g.,* Ex. 6, Operative Report for Patient A.P.)  The routine use of medically unnecessary epidurograms appears designed to justify a separate $1,650 charge for each epidurogram purportedly performed during each ESI.

### 2.     Risks and Costs Associated with Spinal Injections

35.     Because ESIs entail the insertion of needles into areas in and around the spine, injections may be performed under fluoroscopic guidance and typically include the use of steroids, these injections involve potentially serious risks and substantially increased costs for the patient.

-15-

Therefore, ESIs should not be performed unless they are medically necessary, and if they are performed, attempts should be made to minimize the risks and costs.  The risks associated with these injection procedures include those associated with the patient's exposure to ionizing radiation from the use of fluoroscopy, the side effects and complications from steroids (e.g., increased blood sugar, increased blood pressure, immunity reduction, adrenal suppression, psychosis, acute and chronic changes to the skin and bones such as fractures, avascular necrosis, and osteoporosis), and the direct procedure risks from the injection such as bleeding, infection, nerve injury, paralysis, and even death.  The performance of ESIs to multiple regions of the spine at the same time, as the Doctor Defendants often perform, only compounds these risks.  Finally, the costs associated with the injection procedures are substantial, as evident in Complete Pain's typical charge, which is over $9,000 per ESI.

36.     As discussed next, the Doctor Defendants did not perform legitimate exams or make legitimate exam findings.  Instead, despite the associated risks and costs, the Doctor Defendants' examinations were performed as a pretext to support their recommendation for a series of three ESIs, often to more than one region of the spine, and in many instances the purported performance of one or more interlaminar ESIs.  This was done to substantially inflate the seriousness and potential value of BI and UM Claims to cause State Farm Mutual and State Farm County to settle those claims within policy limits, and often for all or most of those limits, to protect themselves and their insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad faith claims.

C.     **The Fraudulent Evaluations and Treatment Recommendations**

37.     The scheme begins with Dr. Sparrow or Dr. Chin conducting cursory initial evaluations that serve as mere pretext for their recommendation of a series of three interlaminar ESIs in at least one region of the spine for virtually every patient reporting neck and/or back pain,

and in multiple areas of the spine for many such patients.  During their initial evaluations, the Doctor Defendants purport to take the patients' history, perform physical exams, reach diagnoses, and arrive at a treatment plan, all of which are documented in their Initial Exam Reports.

### 1.    Fraudulent Exam Findings

38.    The Initial Exam Reports do not reflect the patient's legitimate examination findings or a medically necessary treatment plan.  Rather, they are boilerplate, include only scant details about the patient's condition, and reveal non-credible patterns.  (*See* Ex. 1A.)  For instance, in the "History of Present Illness" section of each report, the Doctor Defendants virtually always document the patient's crash "has affected his/her activities of daily living," regardless of the severity or location of the patients' condition(s) or symptoms.  (*Id.*, column H.)  Next, in the "Review of Systems" section, the Doctor Defendants find virtually every patient experiences no abnormalities in twelve distinct systems within their body, including constitutional, eyes, ears, nose, mouth, throat, cardiovascular, respiratory, gastrointestinal, skin, psychiatric, and neurological.  (*Id.*, column I.)  Finally, in the "Physical Exam" section, Dr. Sparrow and Dr. Chin virtually always find the patient's (a) motor strength is 5/5 in his or her neck and extremities, (b) sensation to both upper and lower extremities is "intact," (c) deep tendon reflexes are "equal," and (d) gait is normal.  (*Id.*, columns J-M.)  The uniformity of these same findings across hundreds of patients, and particularly hundreds of patients with radiculopathies and other conditions that would warrant ESIs, is not credible and suggests the Doctor Defendants did not legitimately examine or evaluate the patients in these areas.

39.    The Doctor Defendants also fail to meaningfully account for the patients' prior medical conditions or treatment.  Based upon the risks and costs associated with ESIs, patients' medical and treatment histories are important considerations in determining whether to

recommend or perform spinal injections.  Among other things, physicians should consider the time and circumstances surrounding the onset of the patient's symptoms, the nature and duration of any treatment the patients have received, and the nature, level, and progress of the patients' responses to such treatment.  Although nearly all patients received some form of prior medical care before seeing Dr. Sparrow or Dr. Chin, their Initial Exam Reports include minimal discussion regarding the care provided or the patients' responses to earlier treatment.  Specifically, the Initial Exam Reports virtually always note: "[w]hen [pain] did not improve [after the crash], [s/]he went to see [provider] and was started on appropriate therapy.  Patient reports temporary relief."  (*See e.g.*, Ex. 7, Initial Exam Report for Patient W.L.)  This description is not meaningful, as it provides no information regarding the type of treatment the patient received, how long he or she received it, the extent and duration of the relief, and why he or she may have stopped treatment.  Moreover, the Initial Exam Reports provide no indication that Dr. Sparrow or Dr. Chin have ever attempted to obtain or review the records associated with the patients' prior treatment and factor them into their examinations or treatment plans.

40.     For example, for patient J.R., Dr. Sparrow recommended a lumbar ESI even though J.R. had not yet undergone any chiropractic or other conservative therapy.  Dr. Sparrow conducted an initial examination of J.R. on November 23, 2016, approximately two weeks after his accident. (Ex. 8, Initial Exam Report for J.R.)  Dr. Sparrow's Initial Exam Report reflects that J.R. complained of constant low back pain and, because J.R. had yet to undergo an MRI, Dr. Sparrow referred him for a lumbar MRI and indicated he should continue physical therapy with his "treating provider" (when he had no such provider).  (*Id.*)  After he underwent an MRI six days later at Memorial, which revealed two purported lumbar herniations, J.R. returned to Complete Pain on December 13, 2016, at which time he underwent a lumbar interlaminar ESI from Dr. Chin, who

conducted no apparent physical examination prior to administering the injection.  (Ex. 9, MRI and Operative Report for J.R.)

41.     For several other patients, the limited descriptions of the patients' prior care in Initial Exam Reports are often inconsistent with their chiropractic records.  For instance, patient E.B. began treating with his chiropractor on September 9, 2016, one day after his accident, at which time he reported severe low back pain that he rated as 10 out of 10.   (Ex. 10, Initial Chiro Records for E.B.)  After more than two months of therapy, during which his documented pain symptoms consistently improved, patient E.B.'s chiropractic records on November 21, 2016, reflect his pain was 3 out of 10 and otherwise describe his low back pain as "aching" and that it "comes and go[es]."  (Ex. 11, Chiro Records for E.B.)  On that same date, Dr. Sparrow prepared an Initial Exam Report for patient E.B., which noted he had only experienced "temporary relief" from his prior conservative care and complained of "constant low back pain."  (Ex. 12, Initial Exam Report for E.B., at 1.)  Based on these findings and others, Dr. Sparrow recommended that E.B. undergo a series of three lumbar ESIs (*id.* at 2), and Complete Pain generated an estimate totaling over $28,000 for the ESIs, even though E.B.'s chiropractic records reflected steady improvement over the course of months.  (Ex. 13, Complete Pain Cost Estimate for E.B.)

42.     The Doctor Defendants virtually always conclude their Initial Exam Reports with recommendations that patients receive either (1) a series of three interlaminar ESIs, often in more than one spinal region, if (a) they complain of generalized neck and/or back pain, regardless of whether the pain radiates to the patients' limbs; and (b) they have undergone one or more spinal MRIs that reveal any evidence of a purported disc herniation, protrusion, or bulge in their spine, regardless of whether the location and severity of any pathologies correlate with the distribution of the patients' symptoms; or (2) spinal MRIs whose findings are then used to support the Doctor

Defendants' recommendations for a series of three ESIs and also serve to bolster demand packages for PI Attorneys. (*See* Ex. 4, Demand Appendix.)

43. The Doctor Defendants' pain descriptions are non-specific and non-credible. Indeed, Dr. Sparrow and Dr. Chin rarely ever quantify the patients' pain levels on a 5- or 10-point scale and instead virtually always describe the pain as "constant" without any indication of the severity of the purported "constant pain." (*See* Ex. 1A, columns O, S.) Moreover, even in the rare instances where they do provide a pain score, their descriptions are often inconsistent with those reflected in records from the patient's other providers. For instance, patient T.B. was discharged by her chiropractor on January 17, 2017, with a pain rating of 3 out of 10 and a notation that her pain was "improving." (Ex. 14, Chiro Records for T.B.) Nine days later, Dr. Sparrow prepared an Initial Exam Report for T.B., in which she documented "the patient complains of constant low back pain with a low back pain score of 9/10" with no indication of any occurrence in the prior nine days causing her extreme pain. (Ex. 15, Initial Exam Report for T.B.)

44. One patient has testified that she never experienced or complained of pain that was documented on her Initial Exam Report. Specifically, patient A.P. testified that, when she appeared for her initial examination at Complete Pain, she only experienced neck and mid back pain, but not low back pain. (Ex. 16, 6/22/2018 Tr. of A.P. at 28:6-16; 35:19-20.) Yet in her Initial Exam Report for A.P., Dr. Sparrow documents that A.P. experienced "constant neck, mid back *and low back pain*." (Ex. 17, Initial Exam Report for A.P., at 1 (emphasis added).) Further, Dr. Sparrow found her to have limited range of motion, tenderness, and pain on extension and flexion of the low back, and she purportedly tested positive for facet loading bilaterally in that region. (*Id.* at 2.) Because A.P. had yet to undergo an MRI, Dr. Sparrow recommended she undergo cervical, thoracic, and lumbar MRIs. (*Id.*) Approximately one month later, after undergoing MRIs at

Memorial that purportedly revealed herniations and/or bulges in all three regions, A.P. returned to receive both a cervical interlaminar ESI and a lumbar interlaminar ESI from Dr. Chin on the same date without undergoing any additional evaluation and without receiving a formal recommendation for those procedures. (Ex. 18, MRI and Operative Reports for A.P.)

45.     Determining whether an ESI is indicated for any patient requires the performance of a legitimate physical examination, which the Doctor Defendants fail to perform.  For patients reporting neck pain during their initial evaluation, Dr. Sparrow and Dr. Chin include only a few short phrases regarding their purported neck examination in which they virtually always find the patients experience "limited range of motion" and "tenderness . . . throughout the paravertebral muscles of the cervical spine," *see* Ex. 1A, columns P-Q, and often note the patients experience "pain with extension and flexion."  For patients reporting low back pain, Dr. Sparrow and Dr. Chin likewise include only a few short phrases regarding their purported lower back examination, in which they virtually always find the patients experience:  (a) "limited range of motion"; (b) "tenderness . . . throughout the paravertebral muscles of the lumbar spine"; (c) pain on extension and/or flexion, and often both; and (d) a positive finding on the facet loading test.  (*Id.*, columns T-W.)  Such uniformity in the general nature of the examination findings across patients is not credible.

46.     The limited information provided on the Initial Exam Reports regarding the Doctor Defendants' purported neck and/or low back findings is not sufficient to evaluate the patients' conditions.  For instance, the "limited" range of motion findings made by the Doctor Defendants for virtually all patients reporting neck and/or back pain fail to include documentation regarding: (a) the specific tests performed to reach particular findings; (b) any objective quantification of the severity of the findings (aside from the word "limited"); (c) the specific muscle groups, nerves,

and/or spinal levels impacted by the findings; or (d) how the findings impact the patients' treatment.

47.     The Doctor Defendants also routinely document the Spurling's test for cervical patients and the straight leg raise test ("SLR test") for lumbar patients, but their findings are not documented in a meaningful manner and the results of those tests do not appear to have any impact on the patients' recommended treatment.  The Spurling's test is performed by a doctor turning the patient's head to each side while extending and applying downward pressure.  The SLR test is performed by a doctor having the patient lay on his or her back, then lifting each of the patient's legs while his or her knee remains straight.  These tests are generally indicated when a patient complains of pain that radiates into his or her upper extremities (for the Spurling's test) or lower extremities (for the SLR test) so that a doctor can determine whether nerve root irritation is the cause of the patient's symptoms.  If the patient experiences pain while the tests are being performed, then the tests are positive and indicate the presence of nerve root irritation, a condition often associated with disc protrusions and/or radiculopathies, which could be indications for an ESI.  Importantly, when a test is positive, the doctor should document that patient's specific responses.  For instance, when an SLR test is positive, the provider should record the affected leg and the angle (in degrees) at which the test elicited pain, as well as the nature, degree, and distribution of the pain to isolate the location and degree of the injury or condition contributing to the patient's symptoms, and to establish a baseline to assess the patient's progress, or lack thereof, over time.  When the Doctor Defendants conduct the Spurling's and SLR tests, they document only basic findings regarding the generalized location of the purported test result (e.g., "positive Spurling's on the left" or "straight leg raise is positive bilaterally") with no other necessary information.

48.     Moreover, the purported results of the Spurling's and SLR tests do not appear to have any impact on the Doctor Defendants' treatment recommendations.  For instance, in the Initial Exam Report for patient Y.R., Dr. Sparrow noted Y.R. complained of "constant neck pain" with no mention of radiating symptoms.  (Ex. 19, Initial Exam Report for Y.R., at 1.)  Despite the lack of radiating symptoms, Dr. Sparrow nevertheless purportedly performed a Spurling's test, which she found was "[n]egative . . . bilaterally."  (*Id.* at 2.)  Nevertheless, Dr. Sparrow ultimately recommended that Y.R. undergo a series of three cervical interlaminar ESIs, even though Y.R.'s purported exam did not reveal the indications and corresponding test results to warrant that procedure.  (*Id.*)  Similarly, for patient J.B., Dr. Chin's Initial Exam Report notes that J.B. complained of "constant low back pain" with no mention of radiating symptoms.  (Ex. 20, Initial Exam Report for J.B., at 1.)  Dr. Chin then purportedly performed an SLR test, which he found was "negative bilaterally."  (*Id.* at 2.)  Dr. Chin ultimately recommended J.B. to undergo a series of three cervical interlaminar ESIs.  (*Id.*)  The symptomology and test results for Y.R. and J.B. do not justify a single ESI, much less a series of three.

## 2.     Fraudulent MRI Findings

49.     The Initial Exam Reports also contain a section devoted to MRI findings, which the Doctor Defendants use to further support their medically unnecessary ESI recommendations.  In that section, the Doctor Defendants (a) repeat the principal findings from the patients' MRI reports, including most notably the existence of any herniations, protrusions, or bulges; and (b) for virtually all patients, include a stock sentence that indicates, "[b]ased on [the] history, MRI report and physical exam[,]" the patient can benefit from a series of three interlaminar ESIs.  (*See* Ex. 1B, column Q; *see also, e.g.,* Ex. 21, Initial Exam Report for R.F.)

50.     Nearly two-thirds of patients treating at Complete Pain receive their MRIs at Memorial, the MRI facility that shares the same ownership and locations as Complete Pain.  As evident in the chart attached hereto as Exhibit 2, the radiologists from Memorial (the "Memorial Radiologists") made a positive finding of disc pathology in at least one spinal region for every single Complete Pain patient who had one or more spinal MRIs at Memorial.  (*See* Ex. 2, MRI Appendix.)  The Memorial Radiologists' routine positive MRI findings across hundreds of patients are not credible.

51.     For those patients for whom State Farm Mutual and State Farm County have obtained MRI films, it is apparent the Memorial Radiologists prepared MRI reports reflecting findings of abnormalities that did not exist and/or findings that grossly exaggerated the severity of abnormalities that may have existed to support medically unnecessary ESI recommendations.  For instance, patient C.T.'s cervical MRI at Memorial was interpreted as abnormal at C6-C7 with a "[b]road-based 2 mm central protrusion-subligamentous disc herniation extend[ing] into the epidural fat and indent[ing] the thecal sac with contact on the ventral cervical cord, and associated moderate canal stenosis, 7.9 mm AP."  (Ex. 22, Memorial Report for C.T.)  The MRI film of patient C.T.'s cervical spine, however, reveals no herniation or protrusion at C6-C7, no stenosis, no extension into the epidural fat, no indentation of the thecal sac, and no contact with the spinal cord.  In her Initial Exam Report for C.T., Dr. Sparrow merely adopted the MRI report's findings and proceeded to recommend that C.T. undergo a series of three cervical interlaminar ESIs.  (Ex. 23, Initial Exam Report for C.T.).

52.     Patient S.W. underwent both a cervical MRI and lumbar MRI at Memorial, both of which were interpreted by a Memorial Radiologist.  In his report for S.W.'s cervical MRI, the radiologist noted positive findings at C5-C6, including a 3.5 mm herniation that extended into the

epidural fat and indented the thecal sac, as well as associated stenosis.  (Ex. 24, Memorial Report for S.W. (Cervical).)   Further, the radiologist specifically found "[t]he intervertebral disc demonstrates decreased central hyperintensity with preservation of the disc height, may suggest an acute/subacute injury with leakage of [the] central disc contents."  (*Id.*)  In other words, he specifically included language in his report suggesting that S.W.'s purported herniation was the result of her accident.  The Memorial Radiologist reached similar findings in his report for S.W.'s lumbar MRI, including a 2 mm herniation at L5-S1 that extended into the epidural fat and indented the thecal sac, as well as stenosis.  (Ex. 25, Memorial Report for S.W. (Lumbar).)  Further, he included an identical sentence in his lumbar report regarding purported leakage of disc contents that "may suggest an acute/subacute injury."  (*Id.*)  The films for S.W.'s cervical and lumbar MRIs, however, reveal no herniations, no stenosis, no extension into the epidural fat, no indentation of the thecal sac, and no leakage of disc contents (and thus no evidence of an "acute/subacute injury").  As was the case with patient C.T., Dr. Sparrow merely adopted these findings in his Initial Exam Report and recommended that S.W. undergo a series of three cervical ESIs and a series of three lumbar ESIs.  (Ex. 26, Initial Exam Report for S.W.)

53.     In addition to supporting the Doctor Defendants' injection recommendations, the Memorial Radiologists' fraudulent MRI reads also serve to bolster demand packages for PI Attorneys.  Specifically, PI Attorneys often use Memorial's findings in their demand letters to support the purported severity of the patient's condition and the need for extensive treatment, including ESIs, and substantial associated charges.  For example, the PI Attorney for patient C.T. (*see supra,* paragraph 51) touted the "abnormal" MRI findings in his demand letter as follows:

> As a result of this accident caused by your insured our client has incurred damages including, but not limited to the medical bills enclosed. Her Doctor referred her for a Cervical MRI on June 21, 2017 that demonstrate at C6-C7 a broad-based 2 mm central protrusion-subligamentous disc herniation extends into the epidural fat and indents the thecal sac, with contact on the ventral cervical cord, and associated moderate canal stenosis, 7.9 mm AP. Her Doctor referred her for a 3 Cervical Epidural Steroid Injections.

(Ex. 27, Demand Letter for C.T., at 2.)  Based in part on these findings and Dr. Sparrow's

recommendation for a series of three cervical ESIs, the PI Attorney demanded that State Farm

Mutual pay "$50,000 or policy limits" within ten days.  (*See id.*)  As an additional example, the

demand letter submitted by the attorney for patient J.B. touted his herniation findings from

Memorial as follows:

> ### J▮▮B▮▮▮▮▮'s Injuries Are Severe
>
> Your insured's negligence caused J▮▮B▮▮▮ to suffer disc herniations in two different parts of his back. At L5-S1 there is a 2.2 mm central disc herniation which indents the thecal sac. My client is also suffering from a disc herniation at L4-L5 which measures 3.0mm in diameter, and it contacts the nerve roots in the lateral recesses. There is also evidence of moderate canal stenosis which measures 8.1mm in diameter. As you can see, there are numerous objective findings to support the nature and severity of Mr. B▮▮▮▮'s claimed injuries.

(Ex. 28, Demand Letter for Patient J.B.)  Based on these findings and J.B.'s current and future

treatment costs, including most notably more than $10,000 in bills from Complete Pain for an

examination and one lumbar ESI and an estimate of "future expenses [that] could reasonably reach

tens of thousands of dollars more" based on J.B.'s purported need for additional ESIs at Complete

Pain, patient J.B.'s attorney demanded that State Farm County pay "the lesser of  insurance 'policy

limits' or $450,000" within 18 days.  (*See id.*)

### 3.   Fraudulent Diagnoses

54.   Based on the non-credible complaints and findings contained in the Initial Exam

Reports, including the fraudulent MRI findings from the Memorial Radiologists, the Doctor

Defendants diagnose virtually all patients reporting neck and/or back pain with the same diagnoses. Specifically, for those patients reporting neck and/or back pain that received MRIs at the time of their initial examination, Dr. Sparrow and Dr. Chin virtually always conclude the patients suffer from both radiculopathies and herniated nucleus pulposuses in the affected spinal regions.[3]  (Ex. 1B, columns H-K.)  These identical diagnoses across hundreds of patients are not credible and merely serve as pretext for the Doctor Defendants' routine recommendations to receive a series of three interlaminar ESIs in one or more regions of the spine.

55.     The Doctor Defendants' documented radiculopathy diagnoses fail to include basic important information necessary to support the diagnoses and are often inconsistent with patients' symptoms and test results.  Radiculopathies are injuries to the sensory or motor nerve roots, which run along the sides of the spine at each vertebral level, and a proper radiculopathy diagnosis should document the specific nerve root(s) (e.g., "left C5 radiculopathy") causing the patient's pain.  The Doctor Defendants only document the spinal region of the purported condition (e.g., "cervical radiculopathy" or "lumbar radiculopathy") and make no effort to identify the vertebral levels of the cervical or lumbar spine where they have indicated the radiculopathies to describe the nature, severity, or distribution patterns of the radicular symptoms or correlate their diagnosis to the patient's symptoms.

56.     Moreover, the Doctor Defendants also frequently reach radiculopathy diagnoses even where a patient reports no radiating pain, which is the principal symptom associated with a radiculopathy.  For example, in the Initial Exam Report for patient Y.R., Dr. Sparrow noted that

---

[3] For those patients that have not yet received an MRI at the time of their initial evaluation, get referred out for an MRI, and return to Complete Pain at a later date, the Doctor Defendants rarely ever conduct a follow-up examination before administering ESIs.  For these patients, the Doctor Defendants virtually always include these same diagnoses in their Operative Reports for the ESI procedures those patients receive.

Y.R. complained of "constant neck pain" with no mention of radiating symptoms.  (*See* Ex. 19, Initial Exam Report for Y.R.)  Despite the lack of radiating symptoms and negative results on the Spurling's test – a test used to assess the presence of a potential cervical radiculopathy – Dr. Sparrow nevertheless diagnosed Y.R. with "cervical radiculopathy" and recommended she undergo a series of three cervical interlaminar ESIs.  (*Id.*)  Similarly, for patient J.B., Dr. Chin's Initial Exam Report notes that J.B. complained of "constant low back pain" with no mention of radiating symptoms.  (*See* Ex. 20, Initial Exam Report for J.B.)   Despite the lack of radiating symptoms and a negative SLR test – a test used to assess the presence of a potential lumbar radiculopathy – Dr. Chin nevertheless diagnosed J.B. with "lumbar radiculopathy" and recommended J.B. undergo a series of three lumbar interlaminar ESIs.  (*Id.*)  Likewise, Dr. Sparrow diagnosed patient F.S. with both cervical radiculopathy and lumbar radiculopathy, despite the fact she never complained of radiating pain, only "constant neck . . . and low back pain," and her corresponding Spurling's and SLR test results were normal. (Ex. 29, Initial Exam Report for F.S.)  Based on these diagnoses, Dr. Sparrow recommended F.S. receive a series of three cervical ESIs and a series of three lumbar ESIs.  (*Id.*)

57.    Similarly, the Doctor Defendants' diagnoses of herniated nucleus pulposuses often do not correlate to imaging findings.  A herniated nucleus pulposus is a condition in which part or all of the soft, gelatinous central portion of an intervertebral disc is forced through a weakened part of the disc, and it is synonymous with herniation and protrusion findings on MRI films.  The Doctor Defendants routinely reach herniated nucleus pulposuses diagnoses even for patients whose MRI reports reveal only bulges with no associated tearing along the spine.  (*Compare* Ex. 30, Lumbar MRI Report for K.S. *with* Ex. 31, Initial Exam Report for K.S.)

### 4.      Fraudulent Treatment Recommendations

58.      Based upon the patient complaints, findings, and diagnoses documented in the fraudulent Initial Exam Report, the Doctor Defendants subject virtually all patients reporting neck and/or back pain to predetermined injection recommendations, which are not tailored to the unique needs of any patient, not altered based upon previous treatments by other providers, not altered due to changes in the patients' conditions, and subject patients to substantial undue risks and costs. Indeed, in their Initial Exam Reports, Dr. Sparrow and Dr. Chin purport to base their injection recommendations on the patient's "history, MRI report and physical exam and the continued complaints of pain and radiculopathy symptoms," even when the patient does not experience any "radiculopathy symptoms" (*i.e.*, radiating pain) and his or her exam findings suggest that no injection is warranted. (Ex. 1B, column Q; *see also* Ex. 31, Initial Exam Report for K.S.)

59.      The Doctor Defendants recommend virtually all patients with neck and/or back pain receive the exact same type of spinal injection, namely interlaminar ESIs. As described above, of the 336 Complete Pain patients at issue who received a formal recommendation for a injection, received an injection without a formal recommendation, or received a "cost estimate" for recommended injections, 332 were recommended and/or received interlaminar ESIs, two received recommendations only for TPIs, one received two separate caudal ESIs without a formal recommendation, one received a cost estimate for a wrist injection despite also having back pain, and none were recommended or received FIs, MBBs, or transforaminal ESIs during their initial evaluations. As described above, FIs and MBBs are also common types of spinal injections, and they have different indications than ESIs. Across hundreds of patients in a legitimate pain management clinical setting, one would expect to see significant variation in the types of procedures recommended and performed.

60.     Moreover, when making their routine recommendations for interlaminar ESIs, the Doctor Defendants virtually always recommend the injections be performed in a "series of three." (Ex. 1B, column O.)   As described above, peer-reviewed medical literature and professional medical society guidelines establish there is no legitimate basis to recommend and perform a series of three ESIs, let alone uniformly do so.   Instead, patients should be examined and assessed after each injection to determine if another injection is warranted.   Accordingly, a recommendation for a series of three ESIs—like those routinely recommended by the Doctor Defendants—is never indicated.   This holds particularly true for the more than 40% of Complete Pain patients who receive recommendations for a series of three ESIs in two or more areas of the spine, meaning the Doctor Defendants recommend that those patients undergo six or more injections based on an initial examination.

### D.     The Fraudulent Operative Reports

61.     For those patients who appear for and receive one or more of their recommended ESIs, the Doctor Defendants and other Complete Pain doctors prepare Operative Reports for the procedures, which Complete Pain submits, and causes to be submitted, along with the Initial Exam Reports and bills, to State Farm Mutual and State Farm County.   Like the Initial Exam Reports, the Operative Reports are boilerplate and not credible.   (Ex. 3, Injection Appendix.)

62.     The Operative Reports reveal virtually every patient receiving an injection also purportedly required an epidurogram.   As described above, epidurograms are typically indicated only if there is a concern regarding a condition, pathology, or structural abnormality in and around the patient's spine that might affect the flow of steroids.   Also, when conducted, a provider should prepare a separate report documenting the findings of the epidurogram.   The Operative Reports provide only a stock sentence regarding the purported epidurograms, noting that they were able to "identif[y] the needle tip within the epidural space with contrast medium spreading cephalad in

caudal from the needle tip[.]"  (Ex. 6, Operative Report for A.P.)  In other words, the Operative Reports never identify any potential condition, pathology, or structural abnormality to justify performing the epidurogram and also never identify any actual condition, pathology, or structural abnormality discovered *during* the epidurogram.

63.     The routine use of medically unnecessary epidurograms appears designed to justify a separate $1,650 charge for each epidurogram.  Remarkably, Complete Pain bills epidurograms for each ESI performed, even if multiple ESIs are performed on the same date of service.  For instance, Dr. Chin performed cervical, thoracic, and lumbar ESIs on patient R.R. on the same date, and he purported to perform an epidurogram on each spinal region.  (Ex. 32, Operative Reports for R.R.)  Accordingly, Complete Pain submitted three separate $1,650 charges for the medically unnecessary epidurograms.  (Ex. 33, Complete Pain Bills for R.R.)

64.     Furthermore, the Doctor Defendants and other providers performing injections at Complete Pain document for almost every patient who supposedly received an ESI the "patient tolerated this procedure well" in the Operative Reports.  It is not credible that, across hundreds of patients with different spinal structures and mechanisms of injury, the Doctor Defendants and other Complete Pain doctors encountered no complications with any of these procedures.

**E.     All of the Above Procedures Were Recommended and Performed to Support Fraudulent Charges**

65.     The purported services described above were designed and carried out to enrich Defendants by inflating the value of BI and UM Claims submitted to State Farm Mutual and State Farm County, causing State Farm Mutual and State Farm County to settle BI and UM Claims that otherwise might not have been settled or pay substantially more to settle the claims, from which Defendants received payment from the PI Attorneys.

66.     For each ESI purportedly performed, Complete Pain prepares a bill totaling over $9,000, which improperly "unbundles" the procedure into the eleven distinct charges.   For instance, the superbill for patient G.C. reflects the following charges for a single ESI procedure:

```
11/02/16 INJECT  LUMBAR SACRAL C 5511.00    .00    .00    .00 5511.00
11/02/16 EPIDUROGRAPHY           1650.00    .00    .00    .00 1650.00
11/02/16 SURGICAL TRAY            200.00    .00    .00    .00  200.00
11/02/16 PRE-OP/RECOVERY ROOM     400.00    .00    .00    .00  400.00
11/02/16 NEEDLE STERILE ANY SIZE   50.00    .00    .00    .00   50.00
11/02/16 OFFICE VISIT EST. LEVEL  250.00    .00    .00    .00  250.00
11/02/16 DEXAMETHASONE SODIUM PH  200.00    .00    .00    .00  200.00
11/02/16 LIDOLOG KIT              710.00    .00    .00    .00  710.00
11/02/16 FLUOROSCOPIC GUIDANCE S  975.00    .00    .00    .00  975.00
11/02/16 LIDOCAINE                150.00    .00    .00    .00  150.00
11/02/16 LOW OSMOLAR CONTRAST 30   20.00    .00    .00    .00   20.00
```

(Ex. 34, Complete Pain Superbill for G.C.)   Virtually all of these charges, including the "pre-op/recovery room," surgical tray, steroid (dexamethasone), and lidocaine, should be included as part of the injection charge and should not be billed separately.   Moreover, it is improper to bill a separate office visit charge on the day of a procedure, which Complete Pain routinely does.   By "unbundling" the charges in this manner, Complete Pain is able to submit a greater aggregate charge and give the appearance patients receive additional services beyond the ESI.

67.     For those patients that receive more than one ESI on a single date of service, Complete Pain bills all of the aforementioned eleven charges two or three times, even though some of them are duplicative.   For instance, patient R.K. purportedly received ESIs in the cervical, thoracic, and lumbar regions of her spine on the same date of service, and Complete Pain proceeded to prepare bills for three office visits, three "pre-op/recovery rooms," and three surgical trays, as well as three times each for the remaining eight charges Complete Pain routinely submits for each ESI.   (Ex. 35, R.K. Bills.)   Additionally, without any explanation or documentation, Complete Pain also billed three additional charges for "moderate sedation" and three additional charges for a sedative (midazolam hydrochloride).   (*Id.*)   Collectively, the bills totaled *more than $29,000* for a single date of service.

68.     Complete Pain also routinely submits separate charges for fluoroscopic guidance ($975) and epidurography ($1,650) for each ESI purportedly performed.  These routine charges are inappropriate for multiple reasons.  First, as described above, performing and billing for an epidurogram is only appropriate when:  (1) there is a suspected abnormality along the spine that would affect the flow of steroid (which the Doctor Defendants and other Complete Pain doctors fail to identify or document) and (2) a separate report is prepared (which the Doctor Defendants and other Complete Pain doctors never prepare).  Second, even assuming the epidurography charges are legitimate (and they are not), the billing code for epidurography includes fluoroscopic imaging, and thus it is inappropriate to bill an additional charge for fluoroscopy.  And third, despite the Centers for Medicare & Medicaid Services (CMS) adopting new billing codes for ESIs that include fluoroscopic imaging in 2017, Complete Pain nevertheless continues to bill those new codes along with separate "unbundled" charges for fluoroscopic imaging.

69.     Complete Pain's charges are grossly excessive.  Even setting aside the improperly unbundled charges for supplies and other overhead, Complete Pain's routine charges for ESIs and epidurograms alone are more than one thousand percent higher than the corresponding reimbursement rates paid by Medicare to providers in the Houston area over the relevant periods, as demonstrated in the following charts:

**2016 COMPARISON OF CHARGES**

| Procedure (CPT Codes) | Complete Pain's Charge | Medicare Rate | % Mark-Up |
|---|---|---|---|
| Interlaminar ESI – Cervical/Thoracic (62310-62311) | $5,511 | $247.33 | 2,128% |
| Interlaminar ESI – Lumbar/Sacral (62312-62313) | $5,511 | $228.10 | 2,316% |

| Procedure (CPT Codes) | Complete Pain's Charge | Medicare Rate | % Mark-Up |
|---|---|---|---|
| Epidurogram (72275) | $1,650 | $115.85 | 1,324% |

### 2017 COMPARISON OF CHARGES

| Procedure (CPT Codes) | Complete Pain's Charge | Medicare Rate | % Mark-Up |
|---|---|---|---|
| Interlaminar ESI – Cervical/Thoracic (62320-62321) | $5,511 | $172.22 | 3,099% |
| Interlaminar ESI – Lumbar/Sacral (62323) | $5,511 | $251.21 | 2,093% |
| Epidurogram (72275) | $1,650 | $118.24 | 1,295% |

### 2018 COMPARISON OF CHARGES

| Procedure (CPT Code) | Complete Pain's Charge | Medicare Rate | % Mark-Up |
|---|---|---|---|
| Interlaminar ESI – Cervical/Thoracic (62320-62321) | $5,511 | $256.97 | 2,044% |
| Interlaminar ESI – Lumbar/Sacral (62323) | $5,511 | $253.64 | 2,073% |
| Epidurogram (72275) | $1,650 | $119.21 | 1,284% |

70.     Complete Pain's excessive charges are intended to inflate the value of BI and UM Claims by increasing the medical expenses allegedly incurred, or which may be incurred, by the patients as a result of their accidents, to induce State Farm Mutual and State Farm County to settle those claims within policy limits, and often at or near policy limits, to protect themselves and their

insureds from potential judgments exceeding policy limits and/or avoid potential liability for bad faith claims.

**F.     State Farm Mutual and State Farm County's Injuries Are Directly Related to and a Natural Consequence of Dr. Chin, Dr. Sparrow, and Complete Pain's Fraudulent Scheme**

71.     The Doctor Defendants and Complete Pain are obligated legally and ethically to act honestly and with integrity.  Yet, the Doctor Defendants and Complete Pain have submitted, and caused to be submitted, to State Farm Mutual and State Farm County bills and documentation that are fraudulent in that they represent the underlying services were actually rendered and were medically necessary when they were not.

72.     The object of the Doctor Defendants and Complete Pain's scheme is to enrich Defendants by causing State Farm Mutual and State Farm County to rely on their fraudulent documentation and bills, thereby incurring damages by agreeing to settle BI and UM Claims that otherwise might not have been settled, or by paying substantially more to settle BI and UM Claims than they would have had they known the Doctor Defendants and Complete Pain's bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the target of the Doctor Defendants and Complete Pain's scheme, and the damages incurred by State Farm Mutual and State Farm County were the direct result and natural consequence of the scheme.

73.     State Farm Mutual and State Farm County have been damaged more than $1.9 million in settling the BI and UM Claims at issue.  The Doctor Defendants and Complete Pain's fraudulent documentation and bills were a substantial factor and, in fact, have caused State Farm Mutual and State Farm County to incur damages by agreeing to settle claims that otherwise might not have been settled, or by paying substantially more to settle these claims than they would have if they had known the bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the target of the Doctor Defendants' and Complete Pain's scheme

and their damages are directly related to and a natural consequence of the scheme. As a result, State Farm Mutual and State Farm County are entitled to more than $1.9 million in damages, or to a lesser amount to be proven at trial, but no less than the amount Defendants actually received as a result of the scheme.

## V.     CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Against Defendants Alj F. Sparrow, M.D. and See Loong Chin, M.D.)

74.     State Farm Mutual and State Farm County incorporate, adopt, and re-allege as though fully set forth herein, each allegation in Paragraphs 1 through 73 above.

75.     Complete Pain Solutions, LLC n/k/a Complete Pain Solutions, PLLC is a corporation and an "enterprise" (the "Complete Pain Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

76.     The Doctor Defendants are and have been employed by and/or associated with the Complete Pain Enterprise.

77.     Since at least September 2015 and continuing uninterrupted to the present, the Doctor Defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Complete Pain Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the above-described scheme to defraud State Farm Mutual and State Farm County by submitting and causing to be submitted fraudulent bills and supporting documentation for examinations, injections, and related services which either were not legitimately performed or were not medically necessary, which in turn caused settlement checks to be deposited in the U.S. mails by State Farm Mutual and State Farm County and delivered on or about the dates reflected on Ex. 4.

78.     Specifically, the bills and supporting documentation the Doctor Defendants submit, and cause to be submitted, for these services through Complete Pain are fraudulent because:

a.     the Doctor Defendants do not perform legitimate examinations of the patients;

b.     patterns in the findings within the Initial Exam Reports prepared by the Doctor Defendants are not credible and serve as pretext to support their predetermined recommendations for spinal MRIs and/or recommendations for three medically unnecessary ESIs in at least one region of the spine – and often multiple regions – for nearly all patients reporting neck and/or back pain (*see* Exs. 1A, 1B);

c.     many of the patients at issue undergo spinal MRIs at Memorial, a facility sharing the same ownership and many of the same office locations as Complete Pain, and the Doctor Defendants use the purported positive findings made by the Memorial Radiologists on virtually all spinal MRIs they read as justification to support their predetermined and medically unnecessary ESI recommendations. (*See* Ex. 2.) Several MRI films read by the Memorial Radiologists reveal they have documented conditions that do not exist or exaggerated the severity of age-expected degenerative conditions that may exist;

d.     the ESIs the Doctor Defendants recommend and purportedly perform are not recommended and performed because they are medically necessary, but rather to substantially inflate the severity and potential value of the patients' insurance claims;

e.     the boilerplate Operative Reports prepared by the Doctor Defendants and occasionally other doctors at Complete Pain for the ESIs they purportedly perform are not credible based upon patterns in the patients' responses to the ESIs (*see* Ex. 3); and

f.     the Doctor Defendants and other doctors at Complete Pain purportedly perform epidurograms in addition to fluoroscopic imaging when conducting ESIs, which is not credible, not medically necessary, and performed to justify a significant additional charge from Complete Pain for each purported epidurogram.

79.     The bills and corresponding mailings, which comprise the pattern of racketeering activity identified through the date of this Complaint, are described in part in Exs. 1A, 1B, 2, 3, and 4, attached hereto.  Representative samples of these bills and supporting documentation are attached as Exs. 6-14-15, 17-26, 29-35.

80.     State Farm Mutual and State Farm County have been injured in their business and property by reason of the above-described conduct in excess of $1.9 million.  The fraudulent documentation and bills Complete Pain and the Doctor Defendants submit, and cause to be submitted, through Complete Pain are at the very least a substantial factor in inducing State Farm Mutual and State Farm County to settle BI and UM Claims they otherwise might not have settled, and by paying substantially more to settle BI and UM Claims than they would have paid had they known the bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the intended targets of the scheme, and their damages are directly related to and a natural consequence of the scheme.  As a result, State Farm Mutual and State Farm County are entitled to damages in excess of $1.9 million, or to a lesser amount to be proven at trial, but no less than the amounts Defendants actually received as a result of the scheme.

WHEREFORE, State Farm Mutual and State Farm County demand judgment against Defendants Alj F. Sparrow, M.D. and See Loong Chin, M.D. for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Against Defendants Alj F. Sparrow, M.D. and See Loong Chin, M.D.)

81.     State Farm Mutual and State Farm County incorporate, adopt, and re-allege as though fully set forth herein each allegation in Paragraphs 1 through 73 above.

82.     The Doctor Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Complete Pain Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the above-described scheme to defraud State Farm Mutual and State Farm County by submitting and causing to be submitted, fraudulent bills and supporting

documentation for examinations, injections, and related services which either were not performed, were not legitimately performed, or were not medically necessary, which in turn caused settlement checks to be deposited in the U.S. mails by State Farm Mutual and State Farm County and delivered on or about the dates reflected on Exhibit 4.

83.    Both of the Doctor Defendants knew of, agreed to, and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for examinations, injections, and related services, which either were not performed, were not legitimately performed, or were not medically necessary, to State Farm Mutual and State Farm County.

84.    State Farm Mutual and State Farm County have been injured in their business and property because of the Doctor Defendants' above-described conduct in that they have collectively paid more than $1.9 million based upon the fraudulent charges.

85.    State Farm Mutual and State Farm County have been injured in their business and property by reason of the above-described conduct in excess of $1.9 million.  The fraudulent documentation and bills Complete Pain and the Doctor Defendants submit, and cause to be submitted, through Complete Pain are at the very least a substantial factor in inducing State Farm Mutual and State Farm County to settle BI and UM Claims they otherwise might not have settled, and by paying substantially more to settle BI and UM Claims than they would have paid had they known the bills and supporting documentation were fraudulent.  State Farm Mutual and State Farm County were the intended targets of the scheme, and their damages are directly related to and a natural consequence of the scheme.  As a result, State Farm Mutual and State Farm County are entitled to damages in excess of $1.9 million, or to a lesser amount to be proven at trial, but no less than the amounts Defendants actually received as a result of the scheme.

WHEREFORE, State Farm Mutual and State Farm County demand judgment against Defendants Alj F. Sparrow, M.D. and See Loong Chin, M.D. for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### MONEY HAD AND RECEIVED
#### (Against All Defendants)

86.     State Farm Mutual and State Farm County incorporate, adopt, and re-allege as though fully set forth herein, each allegation in Paragraphs 1 through 73 above.

87.     State Farm Mutual and State Farm County conferred a benefit upon Defendants by paying more than $7.1 million to settle the BI and UM Claims at issue, and Complete Pain and the Doctor Defendants' fraudulent bills and supporting documentation were at the very least a substantial factor in inducing State Farm Mutual and State Farm County to settle BI and UM Claims they otherwise might not have settled, and pay substantially more to settle BI and UM Claims than they would have had they known the bills and documentation were fraudulent.

88.     The money Defendants obtained in connection with the BI and UM Claims at issue in equity and good conscience belongs to and should be returned to State Farm Mutual and State Farm County.

89.     Defendants are in a unique position to know the amount of money they received from the more than $6.1 million that State Farm Mutual has paid and the more than $1.0 million State Farm County has paid to settle the BI and UM Claims at issue.  State Farm Mutual and State Farm County are not currently aware of the precise amount of money Defendants received. However, based upon the substantial amounts of Complete Pain's charges in the BI and UM Claims at issue – more than $4 million – State Farm Mutual and State Farm County allege, on information and belief, that the amounts received by Defendants are substantial.

90.     Because Complete Pain and the Doctor Defendants' services were not performed, not legitimately performed, or not medically necessary, they had no value.  Therefore, in equity and good conscience, Defendants should be required to pay restitution to State Farm Mutual and State Farm County in an amount equal to the total amounts they received as a result of the more than $7.1 million that State Farm Mutual and State Farm County collectively paid to settle the BI and UM Claims at issue.

91.     Based upon Complete Pain and the Doctor Defendants' material misrepresentations and other affirmative acts to conceal their conduct from State Farm Mutual and State Farm County, their injuries were inherently undiscoverable.  Despite State Farm Mutual and State Farm County's diligence in uncovering the injurious conduct, State Farm Mutual and State Farm County did not discover and should not have reasonably discovered that its damages were attributable to Defendants' conduct until May 2017, at the earliest.

WHEREFORE, State Farm Mutual and State Farm County demand judgment against Defendants for the above-described damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm County demand a trial by jury.

Dated this 23rd day of July, 2020.

By:  /s/ Ross O. Silverman

Ross O. Silverman
(*admission pro hac vice pending*)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661-3693
(312) 902-5200
ross.silverman@kattenlaw.com

ATTORNEY-IN-CHARGE FOR
PLAINTIFFS STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY AND STATE FARM
COUNTY MUTUAL INSURANCE
COMPANY OF TEXAS

Of Counsel:

Jared T. Heck
(*admission pro hac vice pending*)
Amelia M. Chapple
(*admission pro hac vice pending*)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL  60661-3693
(312) 902-5200
jared.heck@katten.com
amelia.chapple@katten.com

Micah Kessler
Nistico, Crouch & Kessler, P.C.
1900 West Loop South, Suite 800
Houston, TX 77027
(713) 781-2889
mkessler@nck-law.com